IN THE UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF MISSOURI
WESTERN DIVISION

| | | |
|---|---|---|
| KAROL K. O'KEEFE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 11-1023-CV-W-REL-SSA |
| MICHAEL J. ASTRUE, Commissioner of | ) | |
| Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## ORDER DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Plaintiff Karol O'Keefe seeks review of the final decision of the Commissioner of Social Security denying plaintiff's application for disability benefits under Titles II and XVI of the Social Security Act ("the Act"). Plaintiff argues that the ALJ erred in (1) failing to conduct a proper credibility assessment, (2) failing to properly assess the opinion of treating physician Dr. Bennett, and (3) assessing a residual functional capacity that is not supported by the substantial evidence. I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff is not disabled. Therefore, plaintiff's motion for summary judgment will be denied and the decision of the Commissioner will be affirmed.

## I.    BACKGROUND

On December 17, 2009, plaintiff applied for disability benefits alleging that she had been disabled since December 1, 2008. Plaintiff's disability stems from neck problems and limited use of her right arm. Plaintiff's application was denied on April 7, 2010. On November 15, 2010, a hearing was held before an Administrative Law Judge. On December 8, 2010, the ALJ found that plaintiff was not under a "disability" as defined in the Act. On August 31, 2011, the Appeals Council denied plaintiff's request for review. Therefore, the decision of the ALJ stands as the final decision of the Commissioner.

## II.     STANDARD FOR JUDICIAL REVIEW

Section 205(g) of the Act, 42 U.S.C. § 405(g), provides for judicial review of a "final decision" of the Commissioner.  The standard for judicial review by the federal district court is whether the decision of the Commissioner was supported by substantial evidence.  42 U.S.C. § 405(g); Richardson v. Perales, 402 U.S. 389, 401 (1971); Mittlestedt v. Apfel, 204 F.3d 847, 850-51 (8th Cir. 2000); Johnson v. Chater, 108 F.3d 178, 179 (8th Cir. 1997); Andler v. Chater, 100 F.3d 1389, 1392 (8th Cir. 1996).  The determination of whether the Commissioner's decision is supported by substantial evidence requires review of the entire record, considering the evidence in support of and in opposition to the Commissioner's decision. Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951); Thomas v. Sullivan, 876 F.2d 666, 669 (8th Cir. 1989).  "The Court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contradictory."  Wilcutts v. Apfel, 143 F.3d 1134, 1136 (8th Cir. 1998) (citing Steadman v. Securities & Exchange Commission, 450 U.S. 91, 99 (1981)).

Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v. Perales, 402 U.S. at 401; Jernigan v. Sullivan, 948 F.2d 1070, 1073 n. 5 (8th Cir. 1991). However, the substantial evidence standard presupposes a zone of choice within which the decision makers can go either way, without interference by the courts.  "[A]n administrative decision is not subject to reversal merely because substantial evidence would have supported an opposite decision."  Id.; Clarke v. Bowen, 843 F.2d 271, 272-73 (8th Cir. 1988).

## III.     BURDEN OF PROOF AND SEQUENTIAL EVALUATION PROCESS

An individual claiming disability benefits has the burden of proving he is unable to return to past relevant work by reason of a medically-determinable physical or mental impairment which has lasted or can be expected to last for a continuous period of not less than

2

twelve months. 42 U.S.C. § 423(d)(1)(A). If the plaintiff establishes that he is unable to return to past relevant work because of the disability, the burden of persuasion shifts to the Commissioner to establish that there is some other type of substantial gainful activity in the national economy that the plaintiff can perform. Nevland v. Apfel, 204 F.3d 853, 857 (8th Cir. 2000); Brock v. Apfel, 118 F. Supp. 2d 974 (W.D. Mo. 2000).

The Social Security Administration has promulgated detailed regulations setting out a sequential evaluation process to determine whether a claimant is disabled. These regulations are codified at 20 C.F.R. §§ 404.1501, et seq. The five-step sequential evaluation process used by the Commissioner is outlined in 20 C.F.R. § 404.1520 and is summarized as follows:

1.      Is the claimant performing substantial gainful activity?

> Yes = not disabled.
> No = go to next step.

2.      Does the claimant have a severe impairment or a combination of impairments which significantly limits his ability to do basic work activities?

> No = not disabled.
> Yes = go to next step.

3.      Does the impairment meet or equal a listed impairment in Appendix 1?

> Yes = disabled.
> No = go to next step.

4.      Does the impairment prevent the claimant from doing past relevant work?

> No = not disabled.
> Yes =  go to next step where burden shifts to Commissioner.

5.      Does the impairment prevent the claimant from doing any other work?

> Yes = disabled.
> No = not disabled.

IV.     *THE RECORD*

The record consists of the testimony of plaintiff and vocational expert Alissa Smith, in addition to documentary evidence admitted at the hearing.

3

## A. ADMINISTRATIVE REPORTS

The record contains the following administrative reports:

### Earnings Record

The record establishes that plaintiff earned the following income from 1974 through 2010, shown in actual and indexed figures:

| Year | Earnings | Indexed Earnings |
|------|----------|------------------|
| 1974 | $ 104.93 | $ 540.08 |
| 1975 | 0.00 | 0.00 |
| 1976 | 1,752.15 | 7,849.70 |
| 1977 | 1,821.25 | 7,697.92 |
| 1978 | 1,837.91 | 7,196.83 |
| 1979 | 503.98 | 1,814.72 |
| 1980 | 0.00 | 0.00 |
| 1981 | 0.00 | 0.00 |
| 1982 | 0.00 | 0.00 |
| 1983 | 0.00 | 0.00 |
| 1984 | 0.00 | 0.00 |
| 1985 | 0.00 | 0.00 |
| 1986 | 0.00 | 0.00 |
| 1987 | 0.00 | 0.00 |
| 1988 | 0.00 | 0.00 |
| 1989 | 0.00 | 0.00 |
| 1990 | 1,356.25 | 2,666.00 |
| 1991 | 0.00 | 0.00 |
| 1992 | 0.00 | 0.00 |
| 1993 | 0.00 | 0.00 |
| 1994 | 898.95 | 1,564.32 |
| 1995 | 0.00 | 0.00 |
| 1996 | 0.00 | 0.00 |
| 1997 | 2,627.88 | 3,960.60 |
| 1998 | 0.00 | 0.00 |

4

| | | |
|---|---|---|
| 1999 | 20,328.00 | 27,576.69 |
| 2000 | 12,173.00 | 15,648.37 |
| 2001 | 22,018.57 | 27,645.32 |
| 2002 | 5,022.00 | 6,242.74 |
| 2003 | 7,213.00 | 8,752.37 |
| 2004 | 0.00 | 0.00 |
| 2005 | 2,725.00 | 3,048.14 |
| 2006 | 15,739.00 | 16,831.76 |
| 2007 | 18,291.00 | 18,711.77 |
| 2008 | 10,501.00 | 10,501.00 |
| 2009 | 7,237.00 | 7,237.00 |
| 2010 | 0.00 | 0.00 |

(Tr. at 125-126).

**Function Report**

In a Function Report dated February 12, 2010, plaintiff reported that cooking dinner is one of the things she does on a typical day, but she does not prepare supper (Tr. at 160-167, 172-179). She said that it is hard to dress and bathe with her right hand, and it is hard to wash her hair. She is unable to sit because the pain is too bad. It takes plaintiff about an hour to prepare a meal. She is able to do light housework and she can put laundry in the washer. It takes her about 15 minutes to load the washer, and she does this once a week. She is able to drive. She uses a computer to shop, and this takes her about an hour per week. She goes to church every week.

Her impairment affects her ability to lift, squat, bend, stand, reach, walk, sit, kneel, talk, hear, climb stairs, see, remember, complete tasks, concentrate, understand, follow instructions, and get along with others. Her impairment does not affect her ability to use her hands. She can walk 30 feet before needing to rest for a couple of minutes. She can pay attention for only five minutes.

5

B.     *SUMMARY OF TESTIMONY*

During the November 15, 2010, hearing, plaintiff testified; and Alissa Smith, a vocational expert, testified at the request of the ALJ.

1.     **Plaintiff's testimony.**

At the time of the hearing, plaintiff was 52 years of age (Tr. at 30).  Plaintiff is 5'2" tall and weighs 105 pounds (Tr. at 31).  Plaintiff has a valid driver's license with no restrictions (Tr. at 31).  She is right-handed (Tr. at 31).  Plaintiff's husband drove her the one hour and 15 minutes to the hearing because that long of a distance is hard for her -- she gets too sick and hurts too much (Tr. at 32).  She had no physical or mental difficulties making the trip as a passenger (Tr. at 32).

Plaintiff has a high school education and some college (Tr. at 33).  Plaintiff took a Spanish class during the summer of 2009 (Tr. at 33).  Plaintiff has not consulted with the Missouri Department of Vocational Rehabilitation for retraining (Tr. at 34).  She and her husband own a handyman business, and her husband has supported her financially since her alleged onset date (Tr. at 34).  The business provides "painting, tiling, things like that" (Tr. at 34).  Plaintiff and her husband have owned the business for 20 years -- she helped with painting, sanding floors, taking tile off and tiling floors, and landscaping (Tr. at 34).  The ALJ pointed out that plaintiff reported $7,237 in self-employment earnings the previous year, but plaintiff testified that she did not do any of the work, her husband did (Tr. at 34).  Her accountant "takes what we make and splits it down the middle" and that is why plaintiff showed earnings on her record without having performed any work (Tr. at 35).  Plaintiff has not done any physical work for her business in the past two years (Tr. at 35).  The ALJ noted that plaintiff had substantial gainful activity in 2008 but testified she performed no work (Tr. at 35).  Her attorney stated that he has seen it done that way many times in the past because "it puts the people in a lower tax bracket for paying taxes." (Tr. at 36).  The ALJ stated, "Well that

6

to me is tax manipulation" (Tr. at 36). When the ALJ tried to clarify that plaintiff had done no

work at all, she stated that she actually answers the phone when customers call, she schedules

the work, and she sends out bills (Tr. at 36). These tasks take plaintiff an hour a week to

perform (Tr. at 37). Plaintiff's guess is that the business grosses around $40,000 a year and

nets about $20,000 per year (Tr. at 37). In addition to that income, plaintiff receives

approximately $120 per month in food stamps (Tr. at 41). Plaintiff has no health insurance

(Tr. at 41).

In 2001 plaintiff had a part-time temporary job for a couple of months reading gas

meters (Tr. at 38). In 1997 she did landscaping -- running mowers and brush cutters to make

paths for the large gas lines (Tr. at 38). When plaintiff worked with her husband, she painted,

she ripped up tile and laid new tile, she resurfaced wood floors by staining, she removed

wallpaper, she put up wallpaper, she used a weed-eater, and did lawn work (Tr. at 38). When

asked why she stopped doing that work, plaintiff said:

> Well it just got to where every morning it would take longer to get ready to go and then
> when I ended up going with him I ended up taking more and more breaks and I usually
> end up sitting. It got to where I would sit all day and I basically wasn't getting anything
> done. And by the time I got home I would hurt so bad and would be in so much pain
> that I had to take a few days off of work.

(Tr. at 39).

Plaintiff and her husband live in a three-bedroom house with two levels and a separate

basement (Tr. at 32). The laundry facilities are on the third floor of the house (Tr. at 32).

Plaintiff has no difficulty getting around her house (Tr. at 33).

Her sole impairment is torticollis in her neck, but she is depressed because of that pain

(Tr. at 39). Plaintiff has not been treated for depression (Tr. at 39). The condition is in the

right side of her neck and began about five years ago (Tr. at 39-40). This was caused by a car

accident, but plaintiff received no settlement from that car accident (Tr. at 40).

7

Plaintiff's pain is confined to the right side of her neck, down her right shoulder and a little bit down into her back (Tr. at 40). It consists of muscle spasms that pull on her neck constantly (Tr. at 40). Plaintiff cannot turn her head to the left because of the pulling on the right side (Tr. at 49-50). She cannot touch her chest with her chin (Tr. at 50). Plaintiff cannot lie on her back or on her right side or the room "swirls" due to vertigo (Tr. at 50). Her doctor treats her neck by shooting Botox in to paralyze the muscles (Tr. at 40). This also limits her use of the muscles and can be "quite a strain" if plaintiff tries to use her muscles (Tr. at 40). The reduction of muscle spasms while losing the use of her muscles is the "lesser of two evils" (Tr. at 40). She has botox injections every three to four months (Tr. at 40). Plaintiff can use her right arm, but because it is painful she chooses not to (Tr. at 41).

Plaintiff's condition is aggravated by standing and walking (Tr. at 43). She can walk from her house to her car (Tr. at 43). She can stand for about ten minutes at a time (Tr. at 43). She can sit for an hour, but it gets very uncomfortable (Tr. at 43). Plaintiff cannot lift even ten pounds with her right arm (Tr. at 43). She can take care of her own personal needs without assistance, and she can drive unassisted for 20 to 30 minutes (Tr. at 43-44). Plaintiff makes breakfast for her husband, but he makes dinner every night because she is too wiped out (Tr. at 45). Plaintiff is unable to shop for groceries or clothing -- she has not gone shopping since the summer of 2009 (Tr. at 45). Plaintiff can load the dishwasher after breakfast (Tr. at 45-46). She cannot do laundry (Tr. at 46). Plaintiff tries to do a little housework, but her husband usually ends up doing it all (Tr. at 46). Plaintiff spends about an hour a week on her computer (Tr. at 46). Plaintiff does no yard work; she does not take out the trash (Tr. at 46). Plaintiff pays bills on the computer (Tr. at 46). She does not have any trouble using a computer, but she does have trouble sitting for very long (Tr. at 50). During the day plaintiff goes to see her dad or she may have lunch with her children, but she has no other hobbies (Tr. at 46-47).

Plaintiff rarely attends church services anymore because it is too painful to sit for an hour (Tr. at 47). Plaintiff and her husband go to restaurants a couple times a month (Tr. at 48).

Plaintiff's condition is about the same as it was on September 1, 2008 (Tr. at 41).

The ALJ asked plaintiff whether she had Botox injections in her face that year, and she said she had not (Tr. at 44). The ALJ said she was looking at records from February of that year indicating that plaintiff had Juvaderm and Botox injections in her face, and plaintiff indicated that the records had to have been mixed up (Tr. at 44). She said she talked to the practitioner about getting injections in her lips, but she did not actually get them (Tr. at 44-45).

Plaintiff was asked whether she had taken any trips since December 1, 2008; and she said, "no" (Tr. at 48).

On a typical day, plaintiff gets up and has coffee and watches the morning news, tries to limber up, starts her husband's breakfast while he tends to the farm animals, then she rests while he goes to work. She puts the dishes in the dishwasher which tires her out and she needs to rest for a couple hours more (Tr. at 48). Then she gets dressed and either goes to see her dad or has lunch with her children, otherwise she stays home and rests some more (Tr. at 48-49). If she has to pay a bill, she gets that done; and if the phone rings for her husband, she answers it (Tr. at 49). By late afternoon, her husband comes home and makes dinner (Tr. at 49). She goes to bed "at dark" (Tr. at 49). She wakes up around 1:00 or 2:00 in the morning and turns the television on until she can fall back asleep (Tr. at 49).

## 2. Vocational expert testimony.

Vocational expert Alissa Smith testified at the request of the Administrative Law Judge. The first hypothetical involved a person who can perform light work with no overhead reaching with either arm; the person can frequently handle and finger and can frequently reach in all directions other than overhead, but cannot do these things constantly (Tr. at 51). The vocational expert testified that such a person could perform plaintiff's past relevant work

9

as a meter reader (Tr. at 51). A meter reader is required to read a certain number of meters per hour or per day (Tr. at 56). The person walks from residence to residence to read meters (Tr. at 56). The person could also work as a photocopy machine operator, with 400 in Missouri and 19,880 in the country (Tr. at 52). The person could be a marker, with 2,050 in Missouri and 92,415 in the country (Tr. at 52). The person could be a routing clerk, with 1,350 in Missouri and 73,960 in the country (Tr. at 52).

The next hypothetical involved a person who had to be away from the work station for unscheduled breaks "beyond what is scheduled" (Tr. at 52-53). If the unscheduled breaks exceeded the usual 15 minutes in the morning, 15 minutes in the afternoon, and a lunch hour, then the need to take breaks would preclude employment (Tr. at 53).

C. *SUMMARY OF MEDICAL RECORDS*

The record shows that all of plaintiff's medical treatment was provided by Dan Bennett, M.D., a plastic surgeon. Treatment notes indicate that plaintiff initially saw Dr. Bennett for cosmetic facial Botox[1] injections as early as February 2000, and that Dr. Bennett performed abdominoplasty[2] surgery in July 2003 (Tr. at 217-221).

---

[1]Botox is a prescription medication that can be used "to improve the look of moderate to severe frown lines between the eyebrows (glabellar lines) in people 18 to 65 years of age for a short period of time." www.botox.com. Botox may also be used "to treat the abnormal head position and neck pain that happens with cervical dystonia (CD) in people 16 years and older." Id.

Cervical dystonia, also called spasmodic torticollis, is a painful condition in which your neck muscles contract involuntarily, causing your head to twist or turn to one side. Cervical dystonia can also cause your head to uncontrollably tilt forward or backward. A rare disorder that can occur at any age, even infancy, cervical dystonia most often occurs in middle-aged people, women more than men. Symptoms generally begin gradually and then reach a point where they don't get substantially worse. There is no cure for cervical dystonia. The disorder sometimes resolves without treatment, but sustained remissions are uncommon. Injecting botulinum toxin into the affected muscles often reduces the signs and symptoms of cervical dystonia. Surgery may be appropriate in a few cases. www.mayoclinic.com.

[2]Popularly referred to as a "tummy tuck," abdominoplasty flattens your abdomen by removing extra fat and skin and tightening muscles in your abdominal wall.

10

In April 2004, Dr. Bennett treated a keloid[3] scar from plaintiff's recent naval piercing, and he repierced plaintiff's navel on June 4, 2004 (Tr. at 216, 314).

Plaintiff returned to Dr. Bennett's office on October 19, 2005, for a "facial improvement" consultation (Tr. at 215). Use of face creams, further Botox, and Restylane[4] were discussed as non-surgical options (Tr. at 215).

Plaintiff received a full face Botox treatment on October 24, 2005 (Tr. at 215, 312). At that time, Dr. Bennett indicated that Botox might help plaintiff's torticollis,[5] which was the first time that the doctor mentioned that medical condition (Tr. at 214). Treatment notes indicate that Dr. Bennett first injected multiple muscles in the right side of plaintiff's neck a few days later, on October 28, 2005 (Tr. at 214, 309). Plaintiff saw Dr. Bennett for Botox injections in February 2006 and April 2007 (Tr. at 213).

On June 25, 2007, plaintiff returned to Dr. Bennett's office for a consultation to address whether a "mini facelift" or a "thread lift" would be possible (Tr. at 213). She returned to see Dr. Bennett in August 2007 to discuss facial improvement options; she received Botox injections to multiple neck muscles at that time (Tr. at 213).

In October 2007, plaintiff had a face lift, fat transfer to multiple areas of her face, and periorbital (pertaining to the area surrounding the socket of the eye) carbon dioxide laser repair (Tr. at 211).

On October 22, 2007, Dr. Bennett noted that plaintiff's face and neck "look[ed] great,"

---

[3]Keloids are the excess growth of scar tissue at the site of a healed skin injury.

[4]According to the manufacturer's website, Restylane is an injectable gel that "can be used in several areas of your face to reveal a younger-looking you," by "add[ing] volume and fullness to the skin to correct moderate to severe facial wrinkles and folds, such as the lines from your nose to the corners of your mouth (nasolabial folds)." www.restylaneusa.com. Restylane "may also be used for lip enhancement in patients over 21 years." Id.

[5]Torticollis is a twisted neck in which the head is tipped to one side, while the chin is turned to the other.

and administered facial Botox injections (Tr. at 210, 295). Plaintiff returned to see Dr. Bennett on three occasions for post-facial surgery follow-up visits on November 2, 14, and 19, 2007 (Tr. at 209-210).

On January 8, 2008, plaintiff had a Botox injection into the right neck, and Dr. Bennett also performed a second repiercing of plaintiff's navel (Tr. at 209, 294).

On June 5, 2008, Botox was injected into plaintiff's right neck (Tr. at 208).

On October 16, 2008, Botox was injected into plaintiff's neck (Tr. at 208).

December 1, 2008, is plaintiff's alleged onset date.

On December 30, 2008, Botox was injected into plaintiff's neck, forehead, and brows (Tr. at 208).

On May 28, 2009, Dr. Bennett administered Botox injections to plaintiff's neck and shoulder (Tr. at 206).

On approximately November 12, 2009, Dr. Bennett administered Botox injections to plaintiff's face, right neck and shoulder (Tr. at 207, 287).

On January 21, 2010, in response to a December 17, 2009, letter from plaintiff's attorney, Dr. Bennett wrote a letter advising he had treated plaintiff for cosmetic improvements since February 9, 2000 (Tr. at 237). He said that on October 24, 2005, Dr. Bennett had told plaintiff she might get some relief from her torticollis with Botox injections. He researched the issue personally and began injections on October 28, 2005, with reported improvement (Tr. at 237). Dr. Bennett concluded his letter by stating:

> I have specialized in cosmetic plastic surgery. I have not made any assessments as to her ability to perform the functions of daily living or employment nor have I evaluated her range of motion at any time. Evaluation of that sort is not a part of my practice, and for that reason I do not feel I can make an assessment as to her ability to be employed.

On February 2, 2010, Dr. Bennett administered Botox to plaintiff's right neck and shoulder (Tr. at 207). Dr. Bennett's treatment records indicate that eight days later, on

February 8, 2010, "pt [patient] desires Juvaderm[6] to lips + NL[7] folds + marionette lines[8] ~ also Botox," that those injections were "[d]one today" to plaintiff's face, and that plaintiff tolerated them well (Tr. at 207, 285). A facial diagram injection record shows the sites where both Botox and Juvaderm were injected into plaintiff's face,[9] and plaintiff signed a consent form for the injection of Juvaderm on that date (Tr. at 284-285).

On March 19, 2010, Dr. Bennett responded to a short questionnaire submitted by Disability Determinations (Tr. at 206). Therein, he noted that plaintiff's neck muscles contract and pull her head to her shoulder on the right side and turn her head to the left. Dr. Bennett noted the spasms are extremely painful and plaintiff is unable to perform the physical work of her husband's business. The use of Botox allows the head to assume a normal position.

---

[6]According to the manufacturer's website, Juvederm is an injectable gel "indicated for correction of moderate to severe facial wrinkles and folds (such as nasolabial folds)." www.juvederm.com/views/what-is-juvederm.

[7]Nasolabial folds, commonly known as "smile lines" or "laugh lines."

[8]Lines going from the corner of the mouth down the side of the chin.



[9] 

13

On June 9, 2010, plaintiff received Botox injections to her face (Tr. at 332-333).

On an illegible date, Dr. Bennett completed a Medical Report Including Physician's Certification/Disability Evaluation (Tr. at 273-274). Everything on the form was marked "n/a" (or "not applicable") except the diagnosis and a summary of the findings on functional capacity. Dr. Bennett wrote, "Patient with Torticollis first addressed in this practice 10-24-05." He noted the primary diagnosis to be cervical dystonia - laterocollis of the right neck. When asked to summarize his findings with an emphasis on functional capacity, Dr. Bennett replied "severe functional disability due to distorted position of her neck."

The form asks the doctor to check whether plaintiff "does" or "does not have" a mental and/or physical disability which prevents her from engaging in that employment or gainful activity for which her age, training, experience or education will fit her. Dr. Bennett left this blank.

## V.    FINDINGS OF THE ALJ

Administrative Law Judge Deborah Van Vleck entered her opinion on December 8, 2010 (Tr. at 14, 16-22). She found that plaintiff met the insured status requirements through June 30, 2012 (Tr. at 17).

Step one. Plaintiff has not engaged in substantial gainful activity since her alleged onset date (Tr. at 17). Although plaintiff worked after her alleged onset date, her work activity did not rise to the level of substantial gainful activity (Tr. at 17).

Step two. Plaintiff has torticollis, a severe impairment (Tr. at 17). Although plaintiff claimed she suffers from depression, the medical record does not support a finding that depression is a severe impairment (Tr. at 18).

Step three. Plaintiff's impairment does not meet a listed impairment (Tr. at 18).

Step four. Plaintiff retains the residual functional capacity to perform light work except that she cannot reach overhead with either arm; she can frequently (but not constantly) reach

14

in other directions, handle, or finger (Tr. at 18). With this residual functional capacity plaintiff can perform her past relevant work as a meter reader (Tr. at 20).

Step five. Alternatively, the ALJ found that plaintiff could perform other jobs existing in significant numbers, i.e., photocopy machine operator, with 19,880 jobs in the country and 400 in the region; marker, with 92,415 jobs in the country and 2,050 in the region; and routing clerk, with 73,960 jobs in the country and 1,350 in the region (Tr. at 21-22).

Therefore, plaintiff was found not disabled at the fourth step of the sequential analysis with an alternative ruling of not disabled at the fifth step.

## VI.    CREDIBILITY OF PLAINTIFF

Plaintiff argues that the ALJ erred in finding that plaintiff's testimony was not credible. Specifically, plaintiff argues that the ALJ determined plaintiff's residual functional capacity prior to determining her credibility, and then rejected her testimony because it did not fit with the residual functional capacity.

## A.    CONSIDERATION OF RELEVANT FACTORS

The credibility of a plaintiff's subjective testimony is primarily for the Commissioner to decide, not the courts. Rautio v. Bowen, 862 F.2d 176, 178 (8th Cir. 1988); Benskin v. Bowen, 830 F.2d 878, 882 (8th Cir. 1987). If there are inconsistencies in the record as a whole, the ALJ may discount subjective complaints. Gray v. Apfel, 192 F.3d 799, 803 (8th Cir. 1999); McClees v. Shalala, 2 F.3d 301, 303 (8th Cir. 1993). The ALJ, however, must make express credibility determinations and set forth the inconsistencies which led to his or her conclusions. Hall v. Chater, 62 F.3d 220, 223 (8th Cir. 1995); Robinson v. Sullivan, 956 F.2d 836, 839 (8th Cir. 1992). If an ALJ explicitly discredits testimony and gives legally sufficient reasons for doing so, the court will defer to the ALJ's judgment unless it is not supported by substantial evidence on the record as a whole. Robinson v. Sullivan, 956 F.2d at 841.

15

In this case, I find that the ALJ's decision to discredit plaintiff's subjective complaints is supported by substantial evidence. Subjective complaints may not be evaluated solely on the basis of objective medical evidence or personal observations by the ALJ. In determining credibility, consideration must be given to all relevant factors, including plaintiff's prior work record and observations by third parties and treating and examining physicians relating to such matters as plaintiff's daily activities; the duration, frequency, and intensity of the symptoms; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Social Security Ruling 96-7p encompasses the same factors as those enumerated in the Polaski opinion, and additionally states that the following factors should be considered: Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board).

The specific reasons listed by the ALJ for discrediting plaintiff's subjective complaints of disability are as follows:

> The claimant alleges difficulty with sleeping, sitting, using arms for long periods. She reported that she can only walk 30 feet before needing to rest, and that she "can't lift, squat, bend, reach, and kneel" and has "trouble standing." She also alleges it is too painful to sit. Claimant even testified to experiencing some vertigo symptoms.
>
> After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairment could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment.
>
> In terms of the claimant's alleged pain symptoms and associated limitations, the medical record fails to corroborate her reported symptoms. Although claimant describes most activities and even sitting to be painful, she reports taking no pain medication. None of the claimant's pain symptoms or functional limitations are documented in the medical records. She also testified she has not seen any physicians other than her plastic surgeon. The records from the plastic surgeon, Dr. Dan Bennett, do not indicate that

16

she sought his assistance with pain or function, but that she came to him for cosmetic treatments, initially Botox treatments and admoninoplasty. Although Dr. Bennett started treating claimant's torticollis with Botox injections in October 2005, his records indicate that she presented to his office for "facial improvement" not for any problems with pain or function. She apparently continued the Botox treatments to her neck because treatment was effective. According to Dr. Bennett's notes she reported she was "much improved" with treatment.

Claimant's condition was apparently present since at least October 2005, and claimant testified that she worked with her impairment. Claimant testified she helped her husband's business providing manual labor, painting, staining wood floors, working with wallpaper, and using a weed-eater. According to the vocational expert, her work with her husband's company was at either the heavy or the "very heavy" exertional levels. Since claimant was able to work with her impairment before her alleged onset date, it strongly suggests her impairment would not currently prevent work.

Although claimant did receive Botox injections in her neck from Dr. Bennett, her overall treatment history [was] primarily cosmetic. For example, claimant received a mini facelift, with fat transfer and a laser skin treatment from Dr. Bennett, in October 2007. Claimant's two most recently reported treatments on February 8, 2010, and June 9, 2010 were cosmetic as claimant received a Juvaderm treatment to her lips and "marionette lines" plus Botox to her face. Dr. Bennett characterizes his treatment of claimant in the same way. If claimant were as limited as she has alleged, she would be expected to seek treatment to reduce her pain and improve her functioning, rather than seeking to improve only her appearance.

Claimant has also made some statements that are inconsistent with the medical evidence of record. For example, claimant testified she had not received any Botox treatments to her face this year. However claimant's treatment records indicate she has had at [least] two cosmetic treatments. There was some disagreement about this evidence by the claimant at [the] hearing, but the evidence clearly states the procedure was done, tolerated well, and post-care instructions given. She also testified not taking any trips since her alleged onset date; however, it appears she modified her treatment in order to accommodate a trip. Claimant also testified that she does not do chores or laundry though she reported pre-hearing that she did some of these things. Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, nevertheless the inconsistencies suggest that the information provided by the claimant generally may not be entirely reliable.

(Tr. at 19-20).

## 1.    *PRIOR WORK RECORD*

Plaintiff's earnings record shows that during 19 years she earned no income. During only six years of her life did plaintiff earn more than she did AFTER her alleged onset date, i.e., in 2009 when she recorded $7,237.00 in earned income. Plaintiff's explanation through her

17

attorney -- that she really did not work but her husband's income was attributed to her to avoid taxes -- if true, is not a factor that supports her credibility.

## 2.    DAILY ACTIVITIES

Plaintiff is able to drive for 20-30 minutes, yet she claims that sitting is too painful. Obviously sitting is part of driving.  Additionally, plaintiff testified at the hearing that she had no difficulty riding in the car for an hour and 15 minutes as a passenger as opposed to driving. This is inconsistent and supports the ALJ's finding.

Although plaintiff testified she did no work at all to earn income after her alleged onset date, she later testified that she answers the phone, does the scheduling, and sends out bills for her husband's business.

## 3.    DURATION, FREQUENCY, AND INTENSITY OF SYMPTOMS

Plaintiff never sought medical care for pain or difficulty with function.  Every medical record establishes that her visit was for cosmetic reasons.  Plaintiff's visits for the year prior to her administrative hearing were for cosmetic reasons.  Her condition first appeared in 2005, yet plaintiff worked at the "heavy" or "very heavy" level for at least three years after that, and actually had earned more income during two of those years than she had in all but two prior years in her entire career.  Plaintiff's failure to complain of pain or any other limitations when she saw Dr. Bennett, her failure to seek any medical treatment other than cosmetic treatment, and her lack of any treatment other than a few Botox injections over the entire length of her alleged disability support the ALJ's credibility finding.

## 4.    PRECIPITATING AND AGGRAVATING FACTORS

There is no evidence of precipitating or aggravating factors.  Plaintiff's testimony that she gets worn out just by fixing her husband breakfast or attempting to load the dishwasher is not supported by the record and is not credible.

18

## 5. *DOSAGE, EFFECTIVENESS, AND SIDE EFFECTS OF MEDICATION*

As the ALJ pointed out, plaintiff claims to be disabled due to severe pain; however, she never complained of pain to her doctor, she never saw any doctor other than a plastic surgeon, she was never put on any medication for pain, and although she argues in her brief that her Botox injections were her pain medication, I note that she received only four Botox injections in her neck or shoulder after her alleged onset date. Also since her alleged onset date, plaintiff received Botox injections to her forehead and brows, again to her face, again to her face for laugh lines and marionette lines, she received Juvaderm injections to her lips, and she again received Botox in her face. Clearly her physical impairment could not be that bad if she was treated for her impairment about half as frequently as she received treatment to improve her appearance.

## 6. *FUNCTIONAL RESTRICTIONS*

Dr. Bennett never recommended that plaintiff restrict any activities; plaintiff never complained of any pain, any limitations, or any difficulties with any physical activities when she visited him; he admittedly never performed any tests and never made any assessments regarding her range of motion or any ability to perform any functions of daily living or employment. Even in a Medical Report prepared for this disability case, Dr. Bennett left blank every part of the form dealing with testing, writing "n/a" instead. He declined to answer whether plaintiff does or does not have a physical impairment which would prevent her from working and he reiterated that he is a plastic surgeon and does not evaluate patients for their physical abilities.

Plaintiff testified that she has three levels to her house and that she has no difficulty getting around her house. Yet she claimed in her Functional Report that it is difficult for her to climb stairs. This is another inconsistency supporting the ALJ's finding.

19

Plaintiff testified that she cannot turn her head to the left, yet she has a valid driver's license with no restrictions and she testified she is able to drive for 20 to 30 minutes at a time. It is not believable that plaintiff would be unable to turn her head but have no driving restrictions.

Plaintiff testified that she can take care of her own personal needs without assistance, yet in an earlier Function Report she stated that it is difficult to dress, bathe, and wash her hair.

B.     CREDIBILITY CONCLUSION

In addition to the factors discussed above, I note that plaintiff testified that her husband earns about $40,000 per year, it is just her husband and herself in the household, she has no health insurance, and she receives about $120 per month in food stamps; yet, she spends her money on regular and frequent cosmetic surgery. This admitted willingness to accept government financial assistance for necessities while spending her money on regular cosmetic procedures does not support her credibility.

Plaintiff denied having received Botox injections in her face during 2010; however, the medical records clearly show that she did. The ALJ pointed out that plaintiff specifically denied having taken any trips that year, yet the medical records indicate that she modified her treatment in order to accommodate a trip.

The ALJ articulated the inconsistencies on which she relied in discrediting plaintiff's subjective complaints, and those inconsistencies are supported by the record. Plaintiff was treated on only four occasions since her alleged onset date with Botox injections to her neck or shoulder, and the records indicate she experienced improvement as a result. Impairments that are controllable or amendable to treatment do not support a finding of disability. Davidson v. Astrue, 578 F.3d 838, 846 (8th Cir. 2009).

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's finding that plaintiff's allegations of disabling symptoms are not credible.

20

## VII.    DR. BENNETT'S OPINION

Plaintiff argues that the ALJ erred in assessing the opinion of Dr. Bennett. Plaintiff's opinion is without merit. Even if Dr. Bennett's final statement, i.e., that plaintiff suffers from "severe functional disability due to distorted position of her neck," can be considered an opinion on her functional limitations, it is not the least bit supported by his own medical records or the lack of any other medical treatment.

A treating physician's opinion is granted controlling weight when the opinion is not inconsistent with other substantial evidence in the record and the opinion is well supported by medically acceptable clinical and laboratory diagnostic techniques. Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005); Ellis v. Barnhart, 392 F.3d 988, 998 (8th Cir. 2005). If the ALJ fails to give controlling weight to the opinion of the treating physician, then the ALJ must consider several factors to determine how much weight to give the opinion: (1) the length of the treatment relationship, (2) frequency of examinations, (3) nature and extent of the treatment relationship, (4) supportability by medical signs and laboratory findings, (5) consistency of the opinion with the record as a whole, and (6) specialization of the doctor. 20 C.F.R. § 404.1527(d)(2) - (5).

Dr. Bennett admitted that he never performed any tests at all, that his practice deals solely with plastic surgery. He never answered any questions about what specific functions plaintiff can or cannot do, he admittedly never measured her range of motion. Her exams for her impairment were infrequent, the nature of their relationship was primarily for cosmetic treatment, there are no medical signs or laboratory findings, he is not a specialist in plaintiff's condition, and there is no other medical history at all in the record which would support a finding that plaintiff is limited to the extent that she cannot perform any work at all in the economy. This argument is wholly without merit.

Case 4:11-cv-01023-REL   Document 14   Filed 11/04/12   Page 21 of 27

## VIII.   *PLAINTIFF'S RESIDUAL FUNCTIONAL CAPACITY*

Finally plaintiff argues that the ALJ erred in determining a residual functional capacity that is not supported by the record.

After considering plaintiff's subjective allegations and the medical evidence of record, the ALJ incorporated into plaintiff's residual functional capacity those impairments and limitations she found credible.  Following her thorough analysis of the evidence as a whole, the ALJ found that plaintiff had the residual functional capacity to perform light work as defined in 20 C.F.R. §§ 404.1567(b) and 416.967(b), except that plaintiff could not reach overhead with either upper extremity.  The ALJ further found that plaintiff could frequently, but not constantly, reach in other directions, handle, or finger.  Substantial evidence supports the ALJ's residual functional capacity finding.

A claimant's residual functional capacity is the most that individual can do despite the combined effects of all of his credible limitations.  20 C.F.R. §§ 404.1545 and 416.945.  An ALJ's residual functional capacity finding is based on all record evidence, including the claimant's testimony regarding his symptoms and limitations, the claimant's medical treatment records, and the medical opinion evidence.  Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010); 20 C.F.R. §§ 404.1545 and 416.945; Social Security Ruling (SSR) 96-8p.  An ALJ may discredit a claimant's subjective allegations of disabling symptoms, which the ALJ properly did in this case.  Although the residual functional capacity formulation is a part of the medical portion of a disability adjudication (as opposed to the vocational portion), it is not based only on "medical" evidence, i.e., evidence from medical reports or sources; rather, an ALJ has the duty to formulate a claimant's residual functional capacity based on all the relevant, credible evidence of record.  Cox v. Astrue, 495 F.3d 614, 619 (8th Cir. 2007) ("[I]n evaluating a claimant's residual functional capacity, an ALJ is not limited to considering medical evidence exclusively."); 20 C.F.R. §§ 404.1545 and 416.945; SSR 96-8p.

22

In this case, the ALJ found that the objective medical evidence and plaintiff's medical treatment history did not support a finding of disability. As the ALJ observed, plaintiff's overall medical treatment history was primarily cosmetic and limited solely to trips to see Dr. Bennett, a doctor who specializes in cosmetic plastic surgery. As the ALJ further noted, none of plaintiff's alleged pain symptoms or functional limitations are documented by the objective medical evidence. Indeed, nowhere in the record are there any radiographic films (such as x-rays, MRI studies, or CT scans) of any kind, and Dr. Bennett evidently found it unnecessary to order such studies. Dr. Bennett's treatment notes are likewise devoid of any objective medical findings or physical examination results documenting any physical deficits attributable to plaintiff's torticollis. In fact, in his January 2010 letter, Dr. Bennett specifically confirmed that he had never "[e]valuated her range of motion at any time." Although an ALJ may not disregard subjective allegations solely because they are not fully supported by objective medical evidence, an ALJ may properly discount the subjective complaints if inconsistencies exist in the record as a whole. Gonzales v. Barnhart, 465 F.3d 890, 895 (8th Cir. 2006); 20 C.F.R. §§ 404.1529(c) and 416.1529(c).

In this case, the ALJ had very little relevant medical evidence to work with. Plaintiff's argument that she chose to ignore any relevant medical evidence is wholly without merit. The substantial evidence in the record as a whole supports the ALJ's residual functional capacity assessment.

IX.     ESTOPPEL

In addition to the above findings, I note that plaintiff -- had her 2009 income consisted of substantial gainful activity -- would be barred from claiming that she was unable to do any work during 2009 because she previously reported, under penalty of perjury, that she had earned income during that year.

23

The doctrine of judicial estoppel is based upon protecting the integrity of the judicial system by prohibiting parties from deliberately changing positions according to the exigencies of the moment. EEOC v. CRST Van Expedited, Inc., 679 F.3d 657, 679 (8th Cir. 2012) (citing New Hampshire v. Maine, 532 U.S. 742, 749-750 (2001)). In deciding whether to apply judicial estoppel, courts look to the following:

> First, a party's later position must be clearly inconsistent with its earlier position. Second, courts regularly inquire whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled. Absent success in a prior proceeding, a party's later inconsistent position introduces no risk of inconsistent court determinations, and thus poses little threat to judicial integrity. A third consideration is whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

New Hampshire v. Maine, 532 U.S. at 750-751.

A court invokes judicial estoppel when a party abuses the judicial forum or process by making a knowing misrepresentation to the court or perpetrating a fraud on the court. Id. "Judicial estoppel prevents a person who states facts under oath during the course of a trial from denying those facts in a second suit, even though the parties in the second suit may not be the same as those in the first." Stallings v. Hussmann Corp. 447 F.3d 1041, 1047 (8th Cir. 2006) (citing Monterey Dev. Corp. v. Lawyer's Title Ins. Corp., 4 F.3d 605, 609 (8th Cir. 1993)). Therefore, a party who takes a certain position in a legal proceeding, "and succeeds in maintaining that position," is prohibited from thereafter assuming a contrary position "simply because his interests have changed," especially if doing so prejudices the party "who acquiesced in the position formerly taken by him." New Hampshire v. Maine, 532 U.S. at 748 (internal quotations and citations omitted).

In Mathews v. Denver Newspaper Agency LLP, 649 F.3d 1199 (10th Cir. 2011), Matthews persuaded an administrative law judge for the Social Security Administration that his impairments rendered him completely disabled from working in any capacity as of June 11,

2005, but later accused his employer in a lawsuit of discriminating against him. In that employment case, he was required to prove that he was qualified to perform the job from which he was demoted during the time that he had also claimed to be disabled from any work. "The two positions are clearly inconsistent and satisfy the standard test for judicial estoppel. Mathews makes no effort to explain the apparent inconsistency as required by <u>Cleveland</u>.[10] Instead, Mathews meekly asserts there is no inconsistency. The conflict, however, is self-evident." <u>Id</u>. at 1209.

In <u>Stallings v. Hussmann Corp.</u>, 447 F.3d 1041 (8th Cir. 2006), Stallings requested three weeks of vacation in August but due to seniority rules was only approved for one week. He failed to come to work those additional two weeks, instead claiming to need the time off under the Family Medical Leave Act to take care of his father. When Hussmann Corp. learned that Stallings was not caring for his father, Stallings was fired in accordance with company policy providing for termination if leave is taken pursuant to the FMLA for reasons not associated with caring for a family member. Stallings sued his employer in connection with his termination. At the time of his termination, Stallings was a debtor in a Chapter 13 bankruptcy proceeding. At no time did he disclose his claims against Hussmann to the bankruptcy court. Because a debtor's failure to list a claim in the mandatory bankruptcy filings is tantamount to a representation that no such claim existed, the court invoked the doctrine of judicial estoppel and granted summary judgment to Hussmann in the employment case.

> The court will not allow the debtor to conceal its claims, get rid of its creditors "on the cheap," and start over with a "bundle of rights." Because the debtor obtained judicial relief on the representation that no claims existed, the debtor is prohibited from resurrecting such claims and obtaining relief on the opposite basis.

<u>Stallings v. Hussmann Corp.</u>, 447 F.3d at 1048, citing <u>Payless Wholesale Distrib., Inc. v. Alberto Culver, Inc.</u>, 989 F.2d 570, 571 (1st Cir. 1993).

---

[10]<u>Cleveland v. Policy Systems Management Corp.</u>, 526 U.S. 795 (1999).

Case 4:11-cv-01023-REL   Document 14   Filed 11/04/12   Page 25 of 27

In Johnson v. ExxonMobil Corp., 426 F.3d 887 (7th Cir. 2005), Johnson filed a Social Security disability case and an Americans with Disabilities Act case. In finding that judicial estoppel applied, the court stated:

> Unlike Cleveland, where the plaintiff argued that she made consistent statements in her ADA claim and the SSDI application, Johnson merely argues that he was mistaken in his SSDI application. As this court has noted, Cleveland does not stand for the proposition that defendants should be allowed to explain why they gave false statements on their SSDI applications, which is essentially what Johnson seeks to do here. See Opsteen v. Keller Structures, Inc., 408 F.3d 390, 392 (7th Cir. 2005) ("[C]ontradictions are unacceptable: a person who applied for disability benefits must live with the factual representations made to obtain them, and if these show inability to do the job then an ADA claim my be rejected without further inquiry.").

Id. at 892 (footnote omitted). The court also noted that Johnson had taken no steps to correct the alleged mistake in his disability case and relinquish those benefits.

Here, we have a person who signed a federal income tax return indicating that she had earned income during 2009. A federal income tax return is signed under penalties of perjury: "Under penalties of perjury, I declare that I have examined this return and accompanying schedules and statements, and to the best of my knowledge and belief, they are true, correct, and complete." Plaintiff herself offered no explanation as to why she would sign such a document. Her attorney offered the explanation that she and her husband would receive a tax advantage by declaring half of her husband's income to be her own.

Plaintiff's later statement to the Social Security Administration and under oath to an Administrative Law Judge that she was unable to perform any job as of December 1, 2008, conflicts with her earlier statement that she had earned income during 2009. Plaintiff cannot simply ignore the apparent contradiction that arises out of the earlier assertion on her federal income tax return. Rather, she must proffer a sufficient explanation. See Cleveland v. Policy Systems Management Corp., 526 U.S. 795 (1999). The only explanation offered in this case was through plaintiff's attorney and was merely the speculation that plaintiff received a tax benefit by claiming to have earned the income that was actually earned by her husband.

26

Based on the above, I find that (1) plaintiff's statements under oath are inconsistent, (2) because her earnings record still reflects the income as having been earned by plaintiff in 2009, clearly she was successfully in convincing the government that she earned the income and thereby received whatever tax advantage her attorney offered by way of explanation, and (3) allowing her to claim income to gain a financial advantage and disclaim that same income to get a financial advantage through disability income would give plaintiff an unfair advantage and impose an unfair detriment on the government if plaintiff were not estopped.

I find that the doctrine of judicial estoppel applies and that had plaintiff's income during 2009 represented substantial gainful activity, she would be estopped from claiming under oath that she was unable to do any work during 2009 due to her impairment when she has previously claimed that she worked and earned the income that was reported to the federal government under penalty of perjury.

## X.  CONCLUSIONS

Based on all of the above, I find that the substantial evidence in the record as a whole supports the ALJ's decision finding plaintiff not disabled.  Therefore, it is

ORDERED that plaintiff's motion for summary judgment is denied.  It is further

ORDERED that the decision of the Commissioner is affirmed.


/s/ Robert E. Larsen

ROBERT E. LARSEN
United States Magistrate Judge

Kansas City, Missouri
November 2, 2012

27